# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROSE DESIA,                                          :
Trustee Barbara Bess Trust,                          :
F/b/o Julius Solomon,                                :
                                                     :
        Plaintiff,       :
                                                     :
v.                                                   :     NO. 3:05 CV 1395 (MRK)
                                                     :
GE LIFE & ANNUITY ASSURANCE                          :
CO.,                                                 :
                                                     :
        Defendant and    :
        Third-Party Plaintiff, :
                                                     :
v.                                                   :
                                                     :
CHRISTOPHER COUTURE, individually,                   :
and in his capacity as Executor of the               :
Estate of Barbara Bess, EDWARD S.                    :
SAVIANO, JAMES STEWART, A.G.                         :
EDWARDS & SONS, INC., MARILYN                        :
BESS BENNETT, BETSY L. PALOZZI,                      :
and THE ESTATE OF BARBARA BESS,                      :
                                                     :
        Third-party Defendants. :

## MEMORANDUM OF DECISION

Pending before the Court is Defendant Genworth's Motion for Summary Judgment [doc. # 185] against Plaintiff Rose Desia, third-party Defendant Saviano's Motion for Summary Judgment [doc. # 183] against third-party Plaintiff Genworth, and third-party Defendants A.G. Edwards and James Stewart's Motion for Summary Judgment against third-party Defendant Saviano [doc. # 195]. For the following reasons, Genworth's Motion for Summary Judgment [doc. # 185] is GRANTED, Defendant Saviano's Motion for Summary Judgment [doc. # 183] and Defendants A.G. Edwards and James Stewart's Motion for Summary Judgment [doc. # 195] are DENIED as moot.

## I.

This case revolves around two annuities owned by the late Dr. Barbara Bess, a physician living in New Haven, Connecticut who died in August 1999. Plaintiff Rose Desia brings suit as the trustee of the Trust u/a Barbara Bess Dated December __, 1998 f/b/o Julius Solomon (the "Solomon Trust") against the Genworth Life and Annuity Insurance Company ("Genworth"),[1] the company that issued the annuities. The Solomon Trust was created for the benefit of Julius Solomon, who was the longtime companion of Dr. Bess and is Ms. Desia's first cousin. Ms. Desia's basic claim is that Genworth breached the annuity contracts by paying the proceeds of the two annuities to Marilyn Bess Bennett and Betsy Palozzi, Dr. Bess's sisters, rather than to the Solomon Trust, which Ms. Desia claims is the rightful beneficiary of the annuities.

Events leading to Dr. Bess's death and the months that followed her death form the focus of this litigation. It is undisputed that on August 15, 1999, Dr. Bess signed two change of beneficiary forms for the Genworth annuities. Although Dr. Bess signed the forms shortly before her death, James Stewart, her financial advisor at A.G. Edwards, did not submit the forms to Genworth until after she had died. The change of beneficiary forms state that the beneficiary of the annuities should be changed from Dr. Bess's sisters, who were the previous beneficiaries of the annuities, to the "Barbara Bess Trust." As requested, Genworth sent confirmation to Dr. Bess's home that it had changed the beneficiary of the two annuities to the "Barbara Bess Trust."[2]

However, neither of the two trusts created in Barbara Bess's name is formally called the

---

[1] During the course of the litigation, Defendant and third-party Plaintiff, GE Life & Annuity Assurance Co. changed ownership and became Genworth Life and Annuity Insurance Company.

[2] Mr. Solomon was later bequeathed the New Haven, Connecticut house in Dr. Bess's will, although he had not yet gained ownership of (but was residing in) the house when Genworth sent the confirmation letters.

"Barbara Bess Trust."  In other words, no trust by the formal name of the "Barbara Bess Trust" exists.  One of the trusts that does exist is the Solomon Trust, whose trustee is the Plaintiff in this action.  The other trust that existed at the time of Dr. Bess's death was called the Barbara Bess Charitable Remainder Unitrust (the "Unitrust"), which had as its beneficiaries Dr. Bess's sisters.

According to Mr. Stewart and Mr. Saviano, who was both Dr. Bess's estate attorney and the attorney for her Estate, Dr. Bess actually intended to change the beneficiary of the annuities to the Estate of Barbara Bess and not to *either* of the trusts.  In July 1999, Mr. Saviano sent a letter to this effect to Mr. Stewart, who was authorized to assist Dr. Bess in making the necessary changes.  The change would not have altered the ultimate beneficiary of the annuities – the sisters were the heirs to Dr. Bess's Estate –  but Mr. Saviano had recommended the change for tax purposes.  According to Mr. Stewart, he brought blank change of beneficiary forms to Dr. Bess's home on Sunday, August 15, 1999 and she signed them in blank.  After his August 15 meeting with Dr. Bess, Mr. Stewart called Mr. Saviano's office to clarify what changes needed to be made but Mr. Saviano was on vacation and did not return his calls.

Unfortunately, Dr. Bess's health took a sudden turn for the worse and she died on August 26, 1999.  Upon receiving the news of her death, Mr. Stewart realized that he had not yet filled out and submitted the change of beneficiary forms.  He could not locate Mr. Saviano's letter and had still not heard back from Mr. Saviano.  In a panic, Mr. Stewart filled in the words "Barbara Bess Trust" and sent the forms to Genworth.  Mr. Stewart contends that when he wrote "Barbara Bess Trust" on the forms, he believed himself to be referring to the Unitrust, which he mistakenly recalled as the entity to which Dr. Bess wanted the beneficiary changed.  After he sent the change of beneficiary forms to Genworth, however, he found Mr. Saviano's letter and realized that he had made a mistake and

that he should have changed the beneficiary of the Genworth annuities to the Estate of Barbara Bess and not to the Unitrust. In essence, then, Mr. Stewart claims that he made two errors: first, he erred in not changing the beneficiary to the Estate of Barbara Bess in accordance with Dr. Bess's estate plan and, second, he erred in writing "Barbara Bess Trust" on the change of beneficiary forms, which does not clearly refer to either of Dr. Bess's trusts then in existence.

Ms. Desia tells a different version of events. In her version, Barbara Bess Trust refers to the Solomon Trust.[3] She has submitted various documents created by the third-party defendants that refer to the Solomon Trust as the Barbara Bess Trust f/b/o Julius Solomon, and from that acknowledged fact, she argues that the Solomon Trust *is* the Barbara Bess Trust. She also alleges that, contrary to the testimony of Mr. Stewart, the forms were not blank when Dr. Bess signed them and that the forms said "Barbara Bess Trust" at that time. Ms. Desia claims that she was present when Dr. Bess signed the forms (although this is disputed by Mr. Stewart) and that after Dr. Bess signed the forms, she asked Mr. Stewart, "Doesn't Rosie have to sign these forms since she's the trustee?" to which Mr. Stewart answered "No." *See* Def.'s Mot. for Summ. J. [doc. # 185], Ex. 15 at 106. In her view, Dr. Bess's question illustrated an intent on behalf of the deceased to change the beneficiary of the annuities to the Solomon Trust, of which she was a trustee. Neither Ms. Desia nor Mr. Solomon had any other conversations with Barbara Bess concerning the annuities before her death. *See* Reply to Resp. to Pl.'s Cross Mot. for Summ. J. [doc. # 247] at 11-12.

What happened after Mr. Stewart discovered the mistake is, for the most part, undisputed. Mr. Stewart contacted Mr. Saviano and told him of his errors. On January 18, 2000, Mr. Saviano

---

[3] Ms. Desia originally filed a Cross Motion for Summary Judgment [doc. # 203], arguing that there was no factual dispute that Barbara Bess Trust was the Solomon Trust. Ms. Desia's counsel withdrew the motion at oral argument.

sent a letter to Genworth, along with an affidavit from Mr. Stewart, stating that the change of beneficiary forms had been completed in error and asking them to recognize Marilyn Bess Bennett and Betsy Palozzi – the previous beneficiaries of the annuities as well as the beneficiaries of Dr. Bess's Estate – as the rightful beneficiaries of the annuities. Genworth agreed to disburse the proceeds of the annuities to the sisters if the trustees of the Barbara Bess Trust submitted affidavits agreeing not to assert a claim to the proceeds. Mr. Saviano and Mr. Stewart identified the Unitrust as the Barbara Bess Trust and submitted affidavits from the Unitrust's trustees, Chris Couture, Dr. Bess's nephew and executor of her Estate, and Peter Oster of A.G. Edwards.[4] All in all, Genworth received affidavits from the executor of Dr. Bess's Estate, Dr. Bess's financial planner, the attorney for both Dr. Bess and the Estate, and from both trustees of the trust Genworth believed to be the Barbara Bess Trust. Upon receiving these affidavits, Genworth disbursed the proceeds to Dr. Bess's sisters.

At some point in 2003, Mr. Solomon came across the confirmation letters Genworth had sent to Dr. Bess in August 1999 stating that the beneficiary on her policies had been changed to the Barbara Bess Trust. After speaking with Ms. Desia, they became convinced that the Solomon Trust should have received the proceeds. Ms. Desia wrote a letter to Genworth asking why the annuities had not been disbursed to the Solomon Trust. Genworth responded by letter on June 26, 2003, stating that the annuities had been disbursed to Marilyn Bess Bennett and Betsy Palozzi in accordance with the request of Dr. Bess's attorney, Mr. Saviano.

---

[4] In fact, the proceeds could not have been paid to the Unitrust because the trust had been invalidated by the IRS for having failed to meet all the necessary requirements before Dr. Bess's death.

Ms. Desia then sued Genworth and A.G. Edwards for breach of contract,[5] on the grounds that Genworth had failed to disburse the proceeds of the annuities to the rightful beneficiary, which in her view was the Solomon Trust.[6] Genworth filed counterclaims against A.G. Edwards and James Stewart, Edward Saviano, Betsey Palozzi, Marilyn Bess Bennett, and Chris Couture for indemnification and contribution. Mr. Saviano filed cross claims against A.G. Edwards and James Stewart. In turn, A.G. Edwards, James Stewart, and Chris Couture filed cross claims against Marilyn Bess Bennett and Betsy Palozzi.[7] Not all of these third-party defendants have filed for summary judgment and as such, the Court does not consider the claims against them.

## II.

As this Court has stated on many previous occasions, summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d

---

[5] Ms. Desia later withdrew her claim against A.G. Edwards. *See* Mot. to Withdraw Pl.'s Breach of Contract Claim [doc. # 221].

[6] Ms. Desia also filed a suit in state court, which is still pending, against certain of the third-party Defendants.

[7] Marilyn Bess Bennett was later dropped from the case on account of her death. *See* Notice of Voluntary Dismissal of Party Marilyn Bess Bennett [doc. # 142].

Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id*. In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.

Genworth argues that it is entitled to summary judgment for three reasons. First, it contends that it complied with the insurance contract and therefore, it cannot be held liable even if it inadvertently paid the proceeds of the annuities to the wrong beneficiary. Second, Genworth asserts that even if it did not comply with the insurance contract, Genworth conducted a reasonably prudent investigation into potentially competing claims and that is all that is required under Connecticut law. Third, Genworth argues that even if Connecticut has adopted a strict liability standard for the payment of annuities, Genworth did in fact pay the rightful beneficiary of the annuities in question – Dr. Bess's sisters.

The Court need not reach the first two grounds – and indeed does not reach them – because it finds for Genworth on the third. Taking all of the evidence in the record in the light most

favorable to the Plaintiff, the Court concludes the Genworth has presented evidence that Dr. Bess intended the beneficiary of the annuities to be her sisters and that Ms. Desia has not presented any evidence to the contrary. Therefore, Genworth is entitled to summary judgment.

## A.

The parties spend a lot of time in their briefs arguing about the meaning of *Bigley v. Pacific Standard Life Insurance Company*, 229 Conn. 459 (1994), which all parties agree is controlling. In *Bigley*, an insurance company paid the proceeds of an insurance policy to a beneficiary that had been named by the policyholder shortly before her death. After the policy had been paid, it was discovered that the change of beneficiary form was fraudulent and that the policyholder had not intended to change the beneficiary. The actual beneficiary of the policy then brought suit for breach of contract. The Connecticut Supreme Court held that the insurance company was not discharged from liability even though it had paid the proceeds of the policy in good faith, because it had not paid the proceeds to the beneficiary actually designated by the policyholder. Ms. Desia argues that *Bigley* adopts a strict liability standard for the payment of annuities. Genworth, on the other hand, argues that *Bigley* merely confirms that an insurance company must comply with the terms of the insurance contract and that nothing in *Bigley* abrogates the general rule that an insurance company must only conduct a reasonably prudent investigation into any competing claims.

One point on which everyone agrees, however, is that *Bigley* stands for the proposition that it is the intent of the policyholder that governs the question of who is the rightful beneficiary. *See id.* at 463 ("Payment of the policy proceeds to a person fraudulently substituted as beneficiary, however, does not relieve the insurer of its contractual obligation to pay the beneficiary *actually designated by the policyholder*." (emphasis added)); *id.* at 464 ("[A]n insurer will be discharged

from liability only when it pays the proceeds in good faith to the beneficiary *actually designated by the policyholder*." (emphasis in original)). *Bigley* is equally clear that Genworth is absolved from liability if it did in fact pay the rightful beneficiary, although Genworth has the burden of proof on this point. *Id.* at 463. The relevant question, then, is whether Genworth has met its burden to show that it paid the beneficiary intended by Dr. Bess, which Genworth claims was Dr. Bess's sisters, and whether Ms. Desia has presented any contrary evidence that would create a disputed issue of material fact.

## B.

Genworth presented the following facts to support its claim that Dr. Bess's sisters were the rightful beneficiaries of the annuities in question. At his deposition, Mr. Saviano testified that he met with Dr. Bess to discuss her estate plan and that they agreed to change the beneficiaries on some of her insurance policies to her Estate for tax purposes. He also testified that Dr. Bess requested that he let Mr. Stewart know "what to do on her death beneficiary designations." Aff. re Def.'s Mot. for Summ. J. [doc. # 238], Ex. 25 at 30. Genworth submitted a letter that Mr. Saviano sent to Mr. Stewart on July 28, 1999, which confirms that the beneficiary of the annuities was to be changed to the Estate of Barbara Bess. *See* Def.'s Mot. for Summ. J. [doc. # 185], Ex. 9 ("In order to effectuate her estate plan, it is important that the death beneficiary of all her qualified retirement savings are her estate."). Dr. Bess was cc'd on this letter and no one has presented any evidence to suggest that she did not receive a copy of it. Mr. Stewart testified that during the meeting in which Dr. Bess signed the change of beneficiary forms, she told him to "make sure you talk to Ed to find out, you know, where the – where the  – where these annuities – which annuities and who are the beneficiaries to be changed to." Supp. Aff. re Def.'s Mot. for Summ. J. [doc. # 249], Ex. 20 at 80.

Unfortunately for everyone involved, Mr. Stewart did not check with Mr. Saviano prior to filling out the change of beneficiary forms. That does not change the fact, however, that Mr. Stewart testified that on the day Dr. Bess signed the forms, she indicated an intent to change the beneficiaries in accordance with the directions of Mr. Saviano, who had instructed Mr. Stewart by letter to change the beneficiary to her Estate.

Ms. Desia admits that she "never had any conversation with Barbara E. Bess wherein Ms. Bess advised Ms. Desia that the [Solomon Trust] was the beneficiary of the Annuities," that she "did not know that Ms. Bess was planning to change the beneficiaries of the annuities nor did she discuss the annuities in front of the Third-Party Defendant James Stewart on August 15, 1999," that she "did not see Barbara Bess or anyone else write 'Barbara Bess Trust' on the [change of beneficiary] forms," and that "after August 15, 1999, there was no further discussion concerning the annuities between Plaintiff and Barbara Bess or between Julius Solomon and Barbara Bess." Reply to Resp. to Pl.'s Cross Mot. for Summ. J. [doc. # 247] at 11-12.

Despite this seeming lack of knowledge of Dr. Bess's intent, Ms. Desia still maintains that she knows that Dr. Bess intended to make the Solomon Trust the beneficiary of the Genworth annuities. To support her supposition, Ms. Desia points to documents that she says show that the Solomon Trust was known as the Barbara Bess Trust.[8] Presumably, Ms. Desia believes these documents are relevant for discerning what the person who filled out the forms meant when they wrote "Barbara Bess Trust." But if it was Mr. Stewart who wrote "Barbara Bess Trust" on the change of beneficiary forms – a fact no one disputes – then what Mr. Stewart meant when he wrote

---

[8] The Court would also point out that none of the documents Ms. Desia submits refers to the Solomon Trust as the "Barbara Bess Trust" without some additional language such as "f/b/o Julius Solomon."

"Barbara Bess Trust" is irrelevant. As the Court explained above, it is Dr. Bess's intent, not Mr. Stewart's, that controls.

Granted, if the forms said "Barbara Bess Trust" when Dr. Bess signed them that would surely be relevant because then she might have assumed that she was changing the beneficiary to the Solomon Trust. But Mr. Stewart testified that the forms were blank when Dr. Bess signed them. *See* Supp. Aff. Re Def.'s Mot. For Summ. J. [doc. # 249], Ex. 20 at 55-56. Although Ms. Desia's counsel at oral argument alleged that the forms were actually filled in when Dr. Bess signed them, Ms. Desia has presented no evidence to that effect. Mr. Solomon testified that he did not see what was written on the forms. *See* Def.'s Mot. for Summ. J. [doc. # 185], Ex. 16 at 372-73. Ms. Desia testified that she did not see Dr. Bess write anything on the forms besides her signature. *See id.* Ex. 15 at 122.

Ms. Desia also rests on the fact that Dr. Bess asked Mr. Stewart "Doesn't Rosie have to sign these forms since she's the trustee?" to which Mr. Stewart answered "No." *Id.* Ex. 15 at 106. Again, this might be an indicator of Dr. Bess's intent if the forms had said "Barbara Bess Trust" when Dr. Bess signed them. But according to uncontradicted evidence, the forms were blank. The Court cannot guess what Dr. Bess meant by this question. For instance, Dr. Bess may have been confused. But that is not inconsistent with her statement to Mr. Stewart that he should fill out the forms according to Mr. Saviano's instructions. And according to the letter sent by Mr. Saviano, his instructions were to change the beneficiary to Dr. Bess's estate. Simply put, the only clear indication we have of Dr. Bess's intent at the time she signed the forms is her statement to Mr. Stewart to make the changes in accordance with Mr. Saviano's instructions. Even assuming, as we must, that Dr. Bess did ask Ms. Desia whether she needed to sign, and even drawing all inferences in Ms. Desia's

favor, the Court simply cannot conclude that Dr. Bess's question alone raises a legitimate disputed issue of material fact.

## C.

If Ms. Desia's only argument against summary judgment was that material facts were in dispute, then the Court's inquiry could end here. However, Ms. Desia also argues that the Court should deny summary judgment because Mr. Stewart's credibility is at issue. In her view, Mr. Stewart is colluding with Mr. Saviano and Mr. Couture to defraud Mr. Solomon out of the proceeds of the annuities and that he is perjuring himself in his deposition and in his affidavit. Genworth's argument for summary judgment admittedly hinges on the testimony of Mr. Stewart. Therefore, the Court must determine whether Ms. Desia's argument concerning Mr. Stewart's credibility warrants denying summary judgment in this case, despite the fact that Ms. Desia has not raised a disputed issue of material fact.

Of course, the well-established rule is that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."). On a motion for summary judgment, district courts simply "*may not* make credibility determinations . . . ." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 118 (2d Cir. 2006) (emphasis added). Even in borderline cases, where the nonmovant has provided only a modicum of evidence to suggest that credibility is an issue, a court should err on the side of sending credibility determinations to the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[T]he

trial courts should act . . . with caution in granting summary judgment . . . where there is reason to believe that the better course would be to proceed to a full trial."). Otherwise, the court is weighing the evidence, which it decidedly cannot do on a motion for summary judgment.

However, "if the [moving party] has made a properly supported motion [for summary judgment], the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden." *Crawford-El v. Britton*, 523 U.S. 574, 600 (2007); *see also Anderson*, 477 U.S. at 256 (holding that a plaintiff may not defeat "a defendant's properly supported motion for summary judgment" if he or she does not offer "any concrete evidence from which a reasonable juror could return a verdict in his favor" but merely asserts that "the jury might, and legally could, disbelieve the defendant[ ]"). In other words, "[the nonmovant] cannot defeat the motion [for summary judgment] by relying . . . on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) ("[G]eneral attacks upon the defendant's credibility are not sufficient to defeat properly supported summary judgment motion."). Rather, summary judgment is appropriate "where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not 'genuine.'" *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998) (citations omitted).

Thus, as one of the leading treatises on procedure advises, "the general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment.

Unsupported allegations that credibility is in issue will not suffice." 10A Wright et al., Federal Practice and Procedure § 2726, at 445 (1998); *see also Corrugated Paper Products, Inc. v. Longview Fibre* Co., 868 F.2d 908, 914 (7th Cir. 1989) (A nonmovant cannot merely "recite the incantation 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."); *United States v. Real Property*, 480 F.3d 841, 844 (8th Cir. 2007) (A nonmovant cannot "simply rest on the hope of discrediting the movant's evidence at trial."); *U.S. Bancorp Oliver-Allen Tech. Leasing v. Hall*, No. 04 Civ. 4986, 2005 WL 1875459, at *4 (S.D.N.Y. 2005) ("[A] party [opposing summary judgment] may not rest upon unsupported allegations or denials, or simply claim without support that evidence adduced by the movant in support of the motion is not credible. Indeed, the very purpose of summary judgment – preserving resources for the adjudication of actual disputes – would be defeated if the non-movant, failing to meet its burden at the summary judgment stage, were given yet another opportunity to uncover and present facts at trial." (citations and quotation marks omitted)); *Fernandez v. China Ocean Shipping Co.*, 312 F. Supp. 2d 369, 378 (E.D.N.Y. 2003) ("Although witness credibility is usually a question for the jury, Fernandez has not produced any evidence to impugn Shen's credibility despite his ability to do so at the deposition. Merely '[t]o assert that [a] witness[ ] may be lying, without any evidence to contradict the witness' testimony cannot defeat a motion for summary judgment."); *Marks v. Nat'l Comm. Assoc., Inc.*, 72 F. Supp. 2d 322, 333 (S.D.N.Y. 1999) ("[T]he nonmovant cannot survive summary judgment simply by asserting that a potential witness's credibility is at issue. Rather, to 'put credibility in issue so as to preclude summary judgment,' the nonmovant must produce 'specific facts' that demonstrate an actual inconsistency."); *County of Orange v. Sullivan*, 752 F. Supp. 643, 647 (S.D.N.Y. 1990) ("If credibility of the movant's witness is challenged by the opposing party and specific bases for

-14-

possible impeachment are shown, summary judgment should be denied. There must, however, be more than mere allegations in a memorandum of law to place credibility in issue and preclude summary judgment.").

In support of her contention that Mr. Stewart's credibility is in question, Ms. Desia submits the following. First, she points out that it is odd that Mr. Stewart and Mr. Saviano waited over four months to contact Genworth after they allegedly discovered the error on the change of beneficiary forms. She believes the Court should draw an inference in her favor that this indicates some nefarious purpose on the part of Mr. Stewart. Second, she alleges that Mr. Stewart forged Dr. Bess's signature on other change of beneficiary forms not at issue in this case, although it appears to the Court that Ms. Desia's only evidence of such a forgery is that she could not uncover any evidence that supports his testimony and, therefore, he must be lying. Third, she points out that during his deposition Mr. Stewart admitted to embellishing the affidavit he submitted to Genworth.

The first two grounds can be disposed of easily. Although it is true that Mr. Saviano waited four months to contact Genworth, Mr. Stewart testified that he contacted Mr. Saviano about the error almost immediately. Ms. Desia has not presented any contrary evidence and, in fact, Mr. Solomon testified that Mr. Stewart spoke with Mr. Saviano shortly after Dr. Bess's death. *See* A.G. Edwards Mot. for Summ. J. [doc. # 195], Ex. G at 91 (Solomon deposition). It seems strange that a delay on the part of Mr. Saviano, the Estate's attorney, could be used to attack the credibility of Mr. Stewart. And although Ms. Desia wants to accuse Mr. Stewart of forging Dr. Bess's signature on other change of beneficiary forms, her argument that Mr. Stewart has not presented any evidence to corroborate his testimony is not the same as presenting evidence herself. Mr. Stewart testified about these matters in his deposition and Ms. Desia has not presented any evidence to the contrary.

Furthermore, the Court finds Ms. Desia's forgery theory inherently implausible.  *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (holding that courts are not required to accept implausible version of facts on summary judgment).  Desia apparently believes that Mr. Stewart forged Dr. Bess's signature on several change of beneficiary forms for other annuities (not the Genworth annuities) that were supposed to benefit Julius Solomon.  Later, these change of beneficiary forms were voided by the insurance companies at the request of Mr. Stewart and the proceeds went to Mr. Solomon as planned.  But why, if Mr. Stewart was indeed attempting to defraud Mr. Solomon out of money, would Mr. Stewart forge Dr. Bess's signature just to spend his time and energy to make sure Mr. Solomon received the money to which he was entitled?  If Ms. Desia is arguing that Mr. Stewart forged these forms after the initiation of the lawsuit in some sort of attempt to obscure his actions on the Genworth annuities, then how does Ms. Desia explain the letter sent from Mr. Saviano to Julius Solomon's attorney on March 9, 2000, confirming that the errors had been fixed?  *See* Reply Aff. of Constantino Fragale [doc. # 246], Ex. L.  Ms. Desia does not explain these inconsistencies, nor does the Court believe she can explain them.

It is true, as Ms. Desia contends, that Mr. Stewart admitted to embellishing the affidavit he sent to Genworth in 2000.  However, the embellishments were minor and immaterial to the central issues in this case.  For instance, Mr. Stewart stated that it became clear in late August 1999 that Dr. Bess's illness was "life threatening."  In his deposition, he admitted that at the time he did not know it was life threatening.  Of course, Dr. Bess's illness *was* life threatening;  she died as a result of it. To call this an inconsistency is a stretch to say the least.  Mr. Stewart also testified that his statement that "I forwarded the change forms to the appropriate annuity companies and on August 26, 1999 Dr. Bess passed away" was misleading because he actually had forwarded the change forms on the

same day as she died. Again, this strikes the Court as more of a clarification than an inconsistency. The third inconsistency Mr. Stewart identified is the fact that he moved offices in the middle of 1999 and he got confused about which office he was working in when the events in the affidavit transpired. In fact, his affidavit states that he had previously worked in both offices and does not specify in which office he was working at the time. Thus, this seems to be more of a confusion on the part of Mr. Stewart during his deposition than an actual inconsistency in his affidavit. The Court simply does not believe that what Mr. Stewart described in his deposition as "embellishments" amount to inconsistencies or falsehoods that call his testimony about Dr. Bess's intent into question. And Ms. Desia has not identified anything else in Mr. Stewart's lengthy deposition testimony that was inconsistent.

Since much depends on the truthfulness of Mr. Stewart's account, the Court ordinarily would be hesitant to grant summary judgment. But there are additional factors in this case that lead the Court to the conclusion that summary judgment is appropriate. First of all, Mr. Stewart's testimony is less suspect than it otherwise might be because he is not the movant, nor does he have any prior relationship with Genworth other than as a co-defendant in this lawsuit. Ordinarily, the Court would be reluctant to accept the testimony of a movant, or someone associated with a movant, on summary judgment because the movant has an interest in the outcome of the case that might call into question the movant's credibility. *Cf. Westport Ins. Corp. v. Laschever*, 06-cv-519, 2008 WL 4426899, at * 9 (D. Conn. Sept. 26, 2008) (finding that affidavit from movant's employee regarding the construction of the contract had "inherent credibility issues"). Granted, as a third-party defendant, Mr. Stewart currently has an interest in whether Genworth is held liable. But Mr. Stewart wrote his affidavit – which is consistent with his later deposition testimony – well before the lawsuit was filed

or, indeed, before any claim by Ms. Desia or anyone else was even anticipated. Ms. Desia already has had a chance to question Mr. Stewart at length about the truthfulness of the affidavit at his deposition, and "where the plaintiff has had the opportunity to depose the defendant to test the defendant's veracity and the plaintiff has failed to 'shake' the defendant's version of the facts . . . summary judgment for the defendant may ordinarily be granted." *Corrugated Paper Products*, 868 F.2d at 914.

Neither has Ms. Desia identified any motive that Mr. Stewart might have had to defraud Mr. Solomon out of the proceeds of the annuities. Ms. Desia's counsel admitted at oral argument that it appears that Mr. Stewart had nothing to gain by changing the beneficiaries of the annuities or correcting his error with Genworth. Mr. Stewart received nothing from Dr. Bess's will, nor did it benefit him financially to have the proceeds of the annuities go to Dr. Bess's sisters rather than to Mr. Solomon. In fact, Mr. Stewart testified that he had never met or talked to Dr. Bess's sisters prior to Dr. Bess's death. *See* Supp. Aff. Re Def.'s Mot. For Summ. J. [doc. # 249], Ex. 20 at 65-66. In addition, Mr. Stewart was a close friend of Dr. Bess and interacted socially with both her and Mr. Solomon. In fact, Mr. Stewart came to the hospital the day that Dr. Bess died, brought Mr. Solomon home, and stayed with him over three hours to comfort him. *See* A.G. Edwards Mot. for Summ. J. [# 195], Ex. G at 88-92 (Solomon deposition). Thus, there is nothing in the record – and Ms. Desia certainly cites nothing – to suggest that Mr. Stewart harbored any ill will towards Mr. Solomon. *Cf. Medeiros v. John Alden Life Ins. Co. of New York*, Nos. 89 CIV. 1278, 88 CIV. 4399, 1990 WL 115606, at * 7 (S.D.N.Y. Aug. 10, 1990) (holding that credibility issues existed in a case concerning a potentially fraudulent beneficiary form, where the evidence suggested that the movant's relationship with the decedent was fraught with difficulties before her death); *Real Property*, 480

-18-

F.3d at 845 ("[I]f the testimony of a witness . . . is necessary to carry the movant's burden of proof, we look carefully at whether the witness is unbiased.").

Moreover, it is not as though Mr. Stewart's affidavit to Genworth and testimony cast him in a positive light. Quite the contrary, Mr. Stewart effectively admitted to Mr. Saviano and Genworth that he was incompetent in handling Dr. Bess's affairs. In his deposition, he also acknowledged that he made a "grave mistake." Supp. Aff. re Def.'s Mot. for Summ. J. [doc. # 249], Ex. 20 at 46. Why Mr. Stewart would choose to portray himself in such an unflattering manner, before the threat of a lawsuit or a claim even existed, is beyond the Court. And, of course, Ms. Desia, provides no explanation. Thus, Ms. Desia has failed to show any "specific bases for possible impeachment," which would, in other situations, cause the Court to deny summary judgment. *See Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375, 394 (S.D.N.Y. 2003).

Furthermore, Genworth has presented documentary evidence that corroborates key parts of Mr. Stewart's testimony. *See Gottlieb*, 84 F.3d at 519 (granting summary judgment even though witness credibility was disputed because witness's testimony was corroborated by independent evidence); *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 81 (5th Cir. 1987) (noting that affidavits "not corroborated by other evidence" deserve closer scrutiny). Most notably, the letter sent by Mr. Saviano to Mr. Stewart makes it clear that the annuities were supposed to be changed to Dr. Bess's Estate, not to the Solomon Trust. At oral argument, Ms. Desia's counsel argued for the first time that this letter had been falsified. But there is absolutely no evidence to support this contention. Arguments of counsel are not evidence.

Finally, this is not a case in which the testimony concerns facts that are completely in control of the witness, such as the witness's own state of mind or intent. *Cf. Carlton v. Mystic Transp., Inc.*,

202 F.3d 129, 134 (2d Cir. 2000) ("[W]here intent and state of mind are in dispute, summary judgment is ordinarily inappropriate."). Thus, this is not a case where a supervisor testifies about his intent in terminating an employee and then demands that the Court accept the supervisor's statement of intent as a proven fact. Rather, Mr. Stewart has testified concerning events that occurred in his presence; the Court has already stated that Mr. Stewart's intent is irrelevant. Ms. Desia – who claims to have been present during the discussion between Dr. Bess and Mr. Stewart and who was a close friend of Dr. Bess – is in an equal, perhaps even a better, position than Mr. Stewart to provide evidence of Dr. Bess's intent. Yet, with the exception of her testimony regarding Dr. Bess's question to Mr. Stewart, she has produced none. *See, e.g., Hart v. Rogers*, No. 550066, 2001 WL 1375967, at * 3 (Conn. Super. Oct. 16, 2001) ("Because the plaintiff has failed to produce any evidence demonstrating the decedent's intent to benefit the plaintiff by transferring her property to the defendants, the defendants are entitled to summary judgment on the first count of the complaint.").

In sum, this is an extraordinarily rare case. Mr. Stewart, who is not aligned with Genworth and has no interest in this litigation, has set forth a plausible and supported explanation of the events surrounding his meeting with Dr. Bess to obtain her signature on the blank change of beneficiary forms. Ms. Desia, by contrast, not only has provided no evidence to contradict Mr. Stewart's version of those events, but also has not put forth any basis on which a reasonable jury could question Mr. Stewart's credibility. If this were even a remotely close question, the Court would not hesitate to send the case to a jury. But it is not a close question, even giving Ms. Desia the benefit of all reasonable inferences. The Court should not send this case to a jury on the sole basis of Ms. Desia's counsel's unfounded hope that he will be able to discredit Mr. Stewart on the witness stand. "Hope

alone will not raise a triable issue." *United States v. Pilot Petroleum Assoc., Inc.*, 712 F. Supp. 1077, 1082 (E.D.N.Y. 1989).

## V.

Because the Court concludes that no reasonable jury could find that the Solomon Trust is entitled to the proceeds of the annuities, the Court finds that Genworth is not liable to Ms. Desia for breach of contract. And because the claims against Mr. Saviano, Mr. Stewart, and A.G. Edwards are dependent on a finding of liability against Genworth, their motions for summary judgment are moot.

For the foregoing reasons, Genworth's Motion for Summary Judgment [doc. # 185] is GRANTED. Accordingly, Defendant Saviano's Motion for Summary Judgment [doc. # 183] is DENIED as moot, and Defendants A.G. Edwards and James Stewart's Motion for Summary Judgment [doc. # 195] is DENIED as moot. **The Clerk is directed to close this file.**

IT IS SO ORDERED.

/s/ Mark R. Kravitz

United States District Judge

**Dated at New Haven, Connecticut: October 24, 2008.**